Good morning, Your Honor. It's Steve Coughlin for the petitioner in this case. And I'd just like to open with all candor to the Court. There has been subsequent Supreme Court ruling in Nijuan. I filed the 28-J letter. And like I say, in all candor, it really... It made it tougher for you. I'm sorry? It made it tougher for you. Absolutely, Judge. And I think it really controls much of the substance of this case. I'm not here to try to hide the ball at all. So what's left for you now? You've had this bad card dealt with you from the Supreme Court, and you have this case. Now that the landscape has changed, what's your best argument? My best argument would be a request to remand of the Board for further briefing on trying to distinguish this case from Nijuan. There are a few underlying facts that, you know, in regard to Ms. Zepico had many co-defendants. Nijuan did not. Ms. Zepico pled to one count in an 11-count indictment. I think there can be distinguishing factors drawn there. But it is a tough sled, Judge. There's no doubt about it. The basic thrust of the argument was the immigration judge used the pre-sentence report from the probation department in the federal court. And it's damning. There's no doubt about it. So my best argument today would be to request further briefing at the Board for those small distinguishing factors. And I would just reserve any other time for rebuttal. I appreciate your presentation. We'll reserve whatever time you have left for rebuttal and hear from the government. Do you wish to argue? Thank you, Judge. Unless Your Honor has any questions, I'll just simply echo the sentiment that Nijuan is controlling this matter. The only thing is the only thing I would say other than that I echo my colleague's sentiments that Nijuan is controlling is that remand in this case really isn't necessary. The Board applied the exact same legal analysis, even though Nijuan hadn't been out. So remand at this point for the Board to be able to essentially cite to Nijuan would be somewhat redundant. Other than that, thank you very much for your time. I think we have the arguments at hand. Do you want any rebuttal time? I think we understand your position entirely, and we'll take a close look at it. So very good. Thank you both for your argument this morning. Next case on the calendar is Walter versus. I'm sorry, that's it. It is not submitted on the briefs. I'm sorry. Good morning, Your Honors. May it please the Court, my name is John Wells, and I represent the appellant in this case, Maria Rose Fanazo. We're here today on Ms. Fanazo's petition for review of final orders of the National Transportation Safety Board in this case. The Board's order is reverse the determination by an administrative law judge that Maria Fanazo did not intentionally falsify certain airman medical applications for an FAA medical certificate. The issue presented upon review to this Court is whether the Board's failure to give deference to the ALJ's credibility determinations and findings in her favor that she did not intend to falsify the applications was contrary to the Board's precedent and, therefore, arbitrary capricious abuse of discretion or not in accordance with law. To understand why the Board reached a result it did in this case, it's important to understand that the ALJ's, correction, that the Board's reasoning directly contravened this Court's guidance in Hart v. McLucas. The Board erred in this case because it substituted an objective standard of review for the credibility-based determination of the ALJ. Subsequent to briefing in this case, the D.C. Circuit decided the Dillman case, and we filed a supplemental notation of that case. Dillman confirmed that the current Board had improperly drifted away from the required subjective inquiry into intent specified by this Court in Hart. On remand to Dillman, the Board itself, in Order E.A. 5528, acknowledged as much and dismissed the Airman's petition, the Airman's, the FAA's order of revocation against the Airman for falsifying three medical application certificates in this case. I would submit that this Court's task here is simplified today because the Board's now acknowledged that it was applying an incorrect objective standard, and that's the standard that was applied in Ms. Fenazza's case. The second point follows naturally as a consequence of the application of that incorrect standard. The Board's misapplication of its precedent in the law led to it misapplying the law and the Board precedent on the issue of scienter, or objective intent, or subjective intent. The Board's objective reweighing of the evidence in Fenazza's case, based upon its own interpretations of questions on the FAA medical application form and of the evidence and of documents in the case, using standards such as the meaning of the questions to a person of ordinary understanding or other such reasoning, is a fact. I think Judge Akuta has a question. The Board can overturn the ALJ. We've said repeatedly if there's a compelling reasoning reason or the finding was clearly erroneous, we've said, or against the overwhelming weight of the evidence, the Board's position. So why was the what the Board did an erroneous application of its standard of review?  The Board's own precedent requires deference to the trial. Right. Deference. But then there's a limit to the deference. There's sort of what we would call a clearly erroneous standard, and that's clearly what the Board said here. We they expressed what their standard was, and they said that was met, that the ALJ had erred in its determination. All right. But reading the Board's order, the Board's analysis was fundamentally flawed because it viewed its own objective understanding of the questions, and this is the type of reasoning that was rejected by Hart and was rejected by the D.C. Circuit. But we upheld a clearly erroneous standard. I mean, that's why I'm having trouble understanding here. I mean, if the Board is authorized per its own precedent and ours to overturn a factual determination when it's clearly erroneous, obviously, then it has to look at the facts. It makes a determination whether there was clear error. And all we're left with is to say, was the Board's application of its clear error standard arbitrary and capricious? So I need to understand what was wrong with the Board's clear finding of the clear error in this particular case. It seemed like there was enough ground there to say this is just erroneous. Well, even though the Board articulated the clearly erroneous standard or compelling reason standard, what it did in reality, reading the Board's order, is it really reweighed the evidence based more upon preponderance of the evidence standard, and that was contrary to what Board precedent required. Does it say preponderance of the evidence, or is that you would have us infer that that's what it was doing? The Board used the words, we reweighed the evidence. And then it proceeded to reweigh the evidence, viewing the evidence based upon objective standards as to what the application questions meant to the Board's own understanding and what certain documents meant to the Board and what the testimony of the F.A. sole witness meant to the Board. But with respect to what the questions meant, aren't we bound by precedent? And so Coliton says you can't be the applicant who fills out the form can't just have this narrow definition to further its own agenda. So that seems to be consistent with what the Board was saying. Why was that wrong? Because I don't believe that rationale fairly inquires into the cyanide. It's the subjective understanding of the person asking the questions that's the key question. The other question that appears is, why was the C.N.T.R. not used against her? Why was the C.N.T.R. not used against her? Well, let's look at this. So for Question 17a, do you currently use any medication, prescription or non-prescription? And so the question is, is the statement none, or the failure to report Ambien or Ativan, a false representation? Well, on his face, that's false, if she was using those drugs, and she didn't report them. So the C.N.T.R. just goes to, she had a narrowing definition in her own mind. Isn't that right? Yes, but in this way. The judge inquired into her truth-telling at the hearing. She testified she used the medication on an intermittent basis. The question says, do you currently use? She testified as to her understanding of the question and why she answered the question the way she did. The judge found her explanation credible. The inquiry into the subjective intent to commit wrongdoing is something that's best handled in a trial-type setting by a witness hearing, by a judge hearing the witness live. I guess my problem here is we were limited to saying whether the board was arbitrary and capricious. And the fact that there was a literally false answer to that question and the board said the ALJ's determination that it was not a false representation was clear error, I'm having trouble seeing why that's arbitrary and capricious on the part of the board. Because as explained in Hart by this Court and explained by Dillman recently in the D.C. Circuit, it's the subjective intent of the individual answering the question that's the important inquiry. So the board can't make its own objective finding based upon other evidence external to her understanding and say we're going to infer intent. That's what we need. So you're not saying false representation. You're going on with knowledge of its falsity. Am I understanding that right? That's correct. So you're saying that she, her argument was she didn't know that you had to disclose that she was taking the Ambien or the Ativan and the ALJ agreed based on its interpretation of what does currently mean. That's absolutely correct, Your Honor. But our the case law says currently means, you know, when it's with things that you are taking during this time frame or getting prescriptions from. So what do we do with the fact that the case law says that currently would include the Ambien or the Ativan that she's taking? I believe the case law also says, Your Honor, that it's her objective understanding of the question that's a relevant inquiry. And here there was evidence in the record that the term currently used may mean used while flying or used at the time of the application. And that's what the judge relied upon to find that her subjective intent in answering the question was to answer truthfully. The precise inquiry is not really what this Court's understanding of the question is or the Board's understanding of the question. The inquiry is what her understanding of the question was. How do you address Culliton, then, that says it's not really the person's understanding when they have this very, very narrow understanding of what the question is asking for? What do we do with Culliton? Well, I would say that Culliton is further defined by the Dillman case and by this Court's explanation of the signature requirement in Hart. So in those, in that case, Culliton would be limited to those facts. And this is a case of omission. It's not a case where you have a separate affirmative representation that directly contradicts what she put on the application. In many of the other cases where there have been found, often on credibility determinations, to have been an intentional falsification, there's other external evidence generated by the applicant themselves that directly contradicts what they do. You don't have this in this case. She read the question allegedly too narrowly. And in this case, the judge found that she may have read it too narrowly, but in doing so, she didn't intentionally vet required information in her own mind. And again, that's something that is reviewed in an appellate setting and civil and administrating tribunals on a high standard, similar to a directed verdict. Could any reasonable inference or fact-finding cause the tribunal to find in favor of a respondent? That's what's done here. The high standard of review was not met, even though the judge, even though the did, in fact, they substituted an impermissible standard. Thank you. Thank you, counsel. We'll give you some time for rebuttal. Thank you. May it please the Court, I'm Agnes Rodriguez on behalf of the Federal Aviation Administration. You'll have to speak up a little. I'm sorry, Your Honor. Or move the mic a little closer, one of the two. I'm Agnes Rodriguez on behalf of the Federal Aviation Administration. May it please the Court. This Court in Andrzejewski did say that the NTSB did have to have a compelling reason to reverse an ALJ's credibility determinations or else find them to be clearly erroneous. And the NTSB did that in this case. And the Dillman case, which Ms. Bonazzo raises in opening argument, is actually very much like the Andrzejewski case. It was a case in which the NTSB never addressed the credibility determination of the ALJ and disregarded it and made its own determination without that. And that's a critical distinction in this case. Well, it seems a little odd in this case. I mean, and as Judge Acutis pointed out, we're dealing with a series of odd standards of review. The Board is supposed to give deference to the ALJ and we're supposed to give deference to the Board. And at the end of the day, it seems to me we're arguing about essentially a factual determination. But the Board does, in its opinion, start off by saying we can't reverse an ALJ unless the decision is arbitrary, capricious or clearly erroneous. And then about three or four paragraphs later, the Board says the weight of the evidence is directly contrary. It didn't say it's clearly erroneous. I mean, I think we've held in our clearly erroneous standard, even if the weight of the evidence may, in our opinion, go the other way. That doesn't meet the clear error standard. So I'm just ‑‑ if you bear with me for a second. So that's the first flag. It appears that they may have misunderstood or misapplied the standard of evidentiary review. And the second one, I think there is some force to the argument that they did seem to apply a strict standard saying, look, we're looking at this application. It's an automatic disqualification. We don't care what the subjective intent was, even though the ALJ was very supportive of the petitioner, said she was absolutely credible. So it's difficult. Those are the two issues for me, is did the Board misapply the clearly erroneous standard? And two, did they actually use an objective standard when they should have applied a subjective standard? So I appreciate your indulgence on that very, very long question. One of the standards by which the Court can ‑‑ I'm sorry, the Board can go about identifying a clearly erroneous credibility determination that doesn't warrant its deference is to find that the overwhelming weight of the evidence is ‑‑ that the ALJ's credibility determinations are against the overwhelming weight of the evidence. That was what the AL ‑‑ that's what the Board did in this particular case. It looked at, and to illustrate that point, it cited to the fact that the ALJ had accepted as sufficiently credible, or part of ‑‑ or the basis of his credit ‑‑ favorable credibility determination of Ms. Fanatso, her description of her visits to Dr. Ingram as simply job counseling, when even Dr. Ingram, during her testimony, did not agree with that characterization. And Ms. Fanatso, in her own testimony during the hearing, acknowledged that she started seeing Dr. Ingram in order to document the insomnia and the anxiety that was caused by the stressful work situation that she had experienced since she had filed a union grievance against her employer. And the NTSB said that that was a very good illustration of how it is that the NTSB's credibility determinations in favor of Ms. Fanatso were just not credible. They were not owed the deference. And it said on its overall review on page 14 of the joint appendix where the ‑‑ or the record excerpts where it's volume 1, tab 2, they said overall they found that the evidence directly and overwhelmingly contradicted the ALJ's finding that Ms. Fanatso had a tremendous amount of credibility. And with respect to this Board's standard of review, there is substantial evidence to support that conclusion in the record. When you look at the explanations, for instance, that Ms. Fanatso gave for not disclosing the numerous visits that she had made to Dr. Seberg over the years, she started out with the first application in October of 2001 saying that she simply forgot that she was preoccupied with an upcoming medical procedure and she'd forgotten her ‑‑ her medical experience at that time. And it was an oversight. It's important to understand that the ALJ wholly discounted as any finding of intentional falsification of this question on his finding that she was not aware that any of her omissions were in reference to a material fact. Now, before I ‑‑ I don't want to get into the discussion of ‑‑ that was a clearly erroneous view of what constitutes a material fact under Hart v. Miss Pookus. I'm going to interrupt you just for a second. It occurred to me what the ALJ was doing. He considered all of those factors and then said, but this witness has a tremendous amount of credibility and I believe her. What way are we to give that? Well, and I need to just kind of walk you through the progression in the record here is that, okay, she says on the one hand on that first application she's not disclosing her visits because she's preoccupied with something else going on in an upcoming and she forgot about Dr. Seberg. But then in explaining why she didn't disclose her use of Ambien on that same application after she'd already admitted that she was using Ambien at the time of that application, she says, I discussed that with Dr. ‑‑ with the AME at the time and he told me it had been endorsed by the FAA and unless I was using it on a continuous basis that I wasn't ‑‑ I didn't need to put it down. And in that respect, those two explanations for two different parts of her omissions on that one same application are inherently in conflict and clearly inherently incredible and that the judge would find that as sufficient is contrary to the evidence. What I took from the ALJ's decision, you may have a different view, is he recognized the conflict and he looked at the demeanor and looked at the testimony and said I believe her explanation even though it may be improbable. So what's wrong with that? Well, that's not what the ALJ did in this case. He did not ‑‑ he actually found that she didn't ‑‑ that the reason why she did not intentionally falsify her omissions to her numerous health care visits to Dr. Seberg was that they weren't in reference to a material fact. On its review, the NTSB, looking to see if it owed deference to that, just found that was against the overwhelming weight of the evidence. Ms. Venazzo's testimony was not even that the reason she didn't put down those visits was because she didn't consider them material. Her very first attempt at an explanation was that she'd forgotten. Then the second time she said she thought that she had previously reported her visit to Dr. Seberg and she didn't think she had to keep putting down her visits to her general practitioner. So then when she was confronted on cross‑examination again, well, if you didn't think you had to put down your visits to your general practitioner since you'd previously reported something that's not supported by the plain weaning of that question 19, why did you put down that you saw him later on in 2006 for a cold? And then she said at that point that she put it down because the cold was very serious and she missed work as a result. So if now her litmus test is that it has to be a condition that is so serious that she misses work, then it again becomes inherently implausible to accept her explanation when despite having complained of anxiety to both Dr. Ingram and Dr. Seberg over the course of years to having been prescribed prescription medication that she knew was anxiety medication and despite that her anxiety and her stress became so acute that she had to take a leave of absence from work back in 2004, she still never reported that she ever saw Dr. Seberg for her visits with respect to anxiety in question 19. And all she said about her visits to Dr. Ingram was that it was job counseling. Again, what the board recognized and what was clearly against the overwhelming weight of the evidence that the ALJ credited of her testimony is that she was making a concerted effort to minimize the true extent of her medical conditions. And when you look at a case like Culliton in which, you know, under that standard you have to consider whether, you know, given the circumstances in which Ms. Finazzo was experiencing and the conditions under which she needed Ambien and she needed Sonata, she was taking sleeping medications from as many as three different doctors at one point, yet she never disclosed that she was seeing any doctor for chronic sleeplessness during all of this. So all of this was just against the overwhelming weight of the evidence with respect to the ALJ finding that Ms. Finazzo had an incredible amount of credibility. It was just very transparent when you look at the record that she was, in fact, trying to minimize. While she was very open to her doctors about all of her conditions, when it came down to putting down her medical history for purposes of the FAA making an informed medical determination of her qualifications, she minimized her medical history. Before you leave, I just want to ask another question, which is on Dillman. Do you think that Dillman changed the legal landscape for the FAA? And if so, how? Not at all, Your Honor. Neither Dillman nor Singleton, which was also cited by Ms. Finazzo's counsel in the 28J letter, altered anything about the three elements and what is required for purposes of establishing a case of falsification. And here, the NTSB addressed why it did not owe deference to the ALJ's credibility determinations in this case. And once it determined that it did not owe deference, then it was. It had the full power under the APA to exercise its full plenary authority to review that evidence and determine whether, in fact, the FAA had established. And that's what the NTSB did in this case. All right. Thank you, Counsel. Any further questions? All right. Your time has expired. Thank you very much. If it may please the Court, I have a few points I would like to address briefly on remand. We'll give you a minute to put them in on the clock. Thank you. First, on the strict liability standard, that is something that was expressly rejected by this Court at heart. And the standard the Board places in this case is really a standard that if the respondent at a particular time, then they didn't report it and the Board thought they should, then that's intentional falsification. I don't think if you read the standard the Board was applying, that's much of an overstatement, if at all. And I would disagree with Counsel that Dillman did not change the landscape in this case. The Board's own opinion on remand indicates as much as it does. It indicates that the Board was, in fact, misreading the law. The Counsel re-argued a lot of the facts in the case. The Judge heard those facts. He heard her explanations. She testified at some length on direct and at much greater length on cross-examination with FAA Counsel. The Judge heard all of that. He believed she was telling the truth. He made a credibility evaluation, and that was the case. You know, Culleton, it was, again, a case where there was an affirmative misrepresentation and a lawsuit for personal injuries that contradicted the medical application. I see my time's up, so we request that the case order be vacated. Thank you, Counsel. The case just heard will be submitted for decision. Thank you both for your arguments.
judges: Settle, Thomas, Ikuta